Filed 1/20/16  P. v. Carrillo CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B255298 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA336902) |
| v. | |
| RAPHAEL CARRILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Kennedy, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Rafael Carrillo (defendant) appeals from his convictions for murder and attempted murder. He contends that the trial court gave erroneous instructions regarding conspiracy and the natural and probable consequences doctrine; that substantial evidence did not support the finding that he knew or reasonably should have known the attempted murder victims were peace officers; that gang evidence was erroneously admitted; that defense counsel rendered ineffective assistance by eliciting inflammatory testimony in cross-examination; that the firearm enhancements violated his constitutional rights to equal protection and due process; and that Penal Code section 190.2 is unconstitutionally vague.[1] Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

A six-count information was filed in 2010 against defendant and two codefendants Jose Angel Gomez (Gomez) and Michael Gomboa Mallari (Mallari).[2] Defendant was charged in count 1 with the murder of Marco Salas (Salas), and in count 3 with the murder of Daniel Leon (Leon), in violation of section 187, subdivision (a). Count 2 alleged assault with a semi-automatic firearm upon Alyssa Solis, in violation of section 245, subdivision (b). Defendant was charged with attempted premeditated murder of a police officer, in violation of sections 664, subdivisions (e) and (f), and 187, subdivision (a), as follows: Los Angeles Police Department (LAPD) Officer Carlos Langarica (count 4), and LAPD Officer Joseph Bain (count 5). In count 6 defendant was to have violated section 246, by shooting at an occupied motor vehicle.

The information specially alleged that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members, pursuant to

---

[1]   All further statutory references are to the Penal Code, unless otherwise indicated.

[2]   Defendant was tried separately from codefendants. Mallari, as part of a lenient plea agreement testified against defendant. Gomez was also charged with a murder committed in jail while awaiting trial in this case.

2

section 186.22, subdivision (b)(1)(C), as to all six counts; pursuant to section 186.22, subdivision (b)(5), as to counts 1, 3, 4, and 5; and pursuant to section 186.22, subdivision (b)(4), as to count 6. In addition, the information alleged the special circumstance that the murder of Salas (count 1) was committed while the defendant was an active participant of the Avenues criminal street gang, and carried out to further the gang's activities, within the meaning of section 190.2, subdivision (a)(22); and that a principal personally and intentionally discharged a firearm, proximately causing the death of Salas, within the meaning of section 12022.53, subdivision (d) and (e)(1). The information further alleged that in the commission of counts 1, 3, 4, 5 and 6, a principal personally used and intentionally discharged a firearm, within the meaning of section 12022.53, subdivisions (b)(c), and (e)(1). As to all counts, it was alleged that defendant had served two prior prison terms within the meaning of section 667.5, subdivision (b).

A jury found defendant guilty of all counts as charged, except count 3, and found true the special allegations and special circumstance. In a bifurcated proceeding on the day of sentencing, the trial court found that defendant had served the two alleged prior prison terms. On March 21, 2014, the trial court sentenced defendant on count 1 to life in prison without the possibility of parole, plus a consecutive term of 25 years to life. As to count 2, the court imposed the consecutive high term of nine years. As to each of counts 4 and 5, a consecutive term of 15 years to life, plus 20 years due to the gang and firearm allegations. The court imposed a consecutive term of one year for each of the two prior prison terms, and imposed but stayed a term of 15 years to life as to count 6. Defendant was awarded 2,217 actual days of presentence custody credit, with no conduct credit, and was ordered to pay mandatory fines and fees in addition to direct victim restitution, later determined to be $10,110 and $163.69.

Defendant filed a timely notice of appeal from the judgment.

**Trial evidence**

### *The shooting of Marco Salas*

On February 21, 2008, at approximately 11:30 a.m., Salas left home to pick up his daughter from Aragon Elementary school, taking his two-year-old granddaughter Alyssa

3

with him. As Salas held Alyssa outside the elementary school, three men shot him about 30 times. Alyssa suffered a large bump on her forehead during the attack. Salas was taken to the hospital where he died as the result of multiple gunshot wounds.

### *Detective Aguilar: Gang culture and the Avenues gang*

LAPD Detective Steven Aguilar testified as the prosecution's gang expert, that for 10 years he was assigned to investigate gangs in northeast Los Angeles, including the Avenues gang and the Cypress Park gang. In this assignment he had almost daily contact with Avenues gang members, either as victims, witnesses or suspects. According to Detective Aguilar, in 2008, there were about 150 members of the Avenues gang, which included several sides, subsets, or cliques, including Drew Street. Drew Street was a major hub of the Avenues gang and the Drew Street subset. The various cliques normally got along with one another, not so with several neighboring gangs, such as Cypress Park and Highland Park gangs. Detective Aguilar described Cypress Park gang as the mortal enemy of the Avenues gang, particularly Drew Street. The gangs knew well the boundaries of each other's territory.

Detective Aguilar described the common signs and symbols used by members of the Avenues gang, as well as usual gang tattoos and graffiti. He testified that the primary criminal activities of the Avenues gang were vandalism, battery, murder, assault with a deadly weapon, drive-by shootings, carjacking, assault on police officers, murder of police officers, and robbery. He presented the certified conviction records of three known Avenues gang members for assault with a semiautomatic firearm committed in 2007, and another for two counts of attempted robbery with use of a firearm.

Detective Aguilar explained that the concept of respect in gang culture meant fear, and individual gang members generally earned respect and loyalty to the gang by not "snitching," by earning money selling drugs, committing vandalism, tagging the neighborhood, and "putting in work," meaning the commission of crimes, usually violent crimes. A gang member could expect to earn a great deal of respect for the murder of a rival gang member, as violence against a rival served to elevate the gang's status, to create fear among rival gang members, to encourage recruitment, and to control the

4

neighborhood by intimidating the public such that residents were afraid to cooperate with law enforcement. Assaulting police officers benefitted the gang by demonstrating a lack of fear of law enforcement and a willingness to shoot at anyone. Gang members would normally be accompanied by fellow gang members when going into rival neighborhoods, to give themselves both a physical and a psychological advantage.

Detective Aguilar became acquainted with defendant as part of his assignment. The detective knew defendant to be a member of the Avenues gang with the moniker of "Stomper." In Detective Aguilar's opinion, defendant was an active member of the gang in February 2008. Detective Aguilar identified photographs of defendant's many gang related tattoos, and explained that such a large number of tattoos indicated his pride in, and dedication to, the gang. Defendant's tattoos included: two "Aves" tattoos, meaning Avenues, one on his forehead and another on the side of his head; "C A" and "CYPS" for Cypress; "N" and "E" for northeast Los Angeles, with "Chico by nature and Drew Street by choice" between each letter;[3] "L.A." for *Las Avenidas* (Avenues in Spanish); a skull tattoo; and "Avenues" in large letters across defendant's abdomen.

Detective Aguilar was also familiar with Gomez, and knew him to be a member of the Avenues gang, with the gang moniker of "Rival."[4] Gomez also had many gang related tattoos which showed that he was a dedicated and active member of the Avenues gang. Detective Aguilar identified a photograph of one of Gomez's tattoos, the number "3200," and explained that it referred to the 3200 block of Drew Street, the central hub of the gang, located between Estara Avenue and Avenue 32. The 3300 block of Drew Street was also part of Avenues territory. Detective Aguilar also identified photographs to two

---

[3]    Detective Aguilar explained that Chico was a subclique of the Avenues when defendant joined the gang in the 1990's.

[4]    Throughout the trial, some witnesses referred to Gomez, Leon, and others only by their gang monikers or nicknames. After first mention and if necessary to avoid confusion, we refer to them by their nicknames or by their moniker, followed by their surnames, if known. Otherwise, we use only their surnames.

other members of the Avenues gang who were active and dedicated in February 2008: Alex "Gunner" Valencia and Noe "Muerto" Segura.

### *Francisco Real:  Gang culture and the Avenues gang*

Francisco "Poncho" Real (Real), a former Avenues "shot caller," testified for the prosecution under a plea agreement with federal prosecutors.  Real testified both as an expert on the Avenues gang and as a percipient witness.

Real estimated there were about 50 members in the Drew Street clique in 2008. Real had grown up with the gang and had brothers in the gang.  Some brothers were in custody, some deceased, including his younger brother Daniel "Danny" Leon, who was shot to death in one of the incidents charged in this case.  In June 2008, Real was arrested with a number of other Avenues gang members, and charged in a federal racketeering indictment of 67 people, including Real's wife and stepfather (who pled guilty and were in custody), and Real's three brothers.  Real testified against defendant at his preliminary hearing in 2010, and testified against other Avenues gang members, including Gomez's brother Carlos "Stoney" Velasquez who were charged with the murder of Deputy Sheriff Juan Escalante.  Real qualified as a gang expert in these proceedings.

Real described a catalog of crimes he had committed for the gang, including collecting "taxes" from people who sold narcotics or engaged in other illegal business in the neighborhood, and committing robberies against some who had not paid their taxes. In January 2008, during one such robbery, a gang member was shot to death in a shootout with a neighbor of the victim.  Real had coordinated the robbery, in which seven accomplices from Drew Street participated.  One of Real's earlier crimes was to assist another gang member in shooting to death a person the Mexican Mafia had ordered the Drew Street Avenues to kill.[5]

---

[5]     Real explained that the Mexican Mafia was a prison gang that included older incarcerated Avenues gang members.  It maintained authority over Southern California Hispanic gangs by taxing their illegal activity and ordering them to commit such crimes as killing a designated person or buying the names of witnesses against them for purposes of intimidation.

As the shot caller and tax collector for Drew Street, Real was the person in charge of the neighborhood. He gave orders, saw they were carried out, issued "green lights" (authorization) to kill specified persons, passed information along to higher ups in the gang, along with collecting taxes for the Mexican Mafia. Not all orders came from the Mexican Mafia, and its approval was not required for the Avenues gang's own "gang banging" activities, which ranged from partying together to putting in work such as robberies, attacks on rival gang members, tagging graffiti, and displaying gang signs to rivals.

Real identified photographs of those Avenues gang members he knew well, including "Muerto" Segura, "Gunner" Valencia, and "Rival" Gomez. For five to ten years before his indictment, Real had known defendant (Stomper) as a member of the Drew Street side of the Avenues gang and the Chicos clique. Real knew Mallari (Phillie), as just a "crackhead" he saw around the neighborhood. Mallari associated with Avenues gang members regularly, and was considered trustworthy.

The Cypress Park gang was the Avenues gang's "enemy number one," and Real described the level of hatred between members of the two gangs as "to the heart." Real explained that the purpose of the gang was to intimidate and frighten people, in order to prevent cooperation with law enforcement, thus allowing the gang to commit crimes such as robbery and narcotics sales. The gang intimidated rival gang members to make them hesitate to come into Avenues territory.

### *The mission*

Mallari also testified under an agreement with the prosecution. Though he had lived in the Avenues neighborhood and associated with the Avenues, he was not a member of the gang. He was called Phillie because he was originally from the Philippines. Mallari was a narcotics addict who purchased drugs from Avenues gang members, and was on Drew Street daily, selling or buying drugs. In February 2008, Mallari was acquainted with several Avenues gang members, including Real, Segura, Valencia, Leon, and Gomez. He had seen defendant around the neighborhood, knew him as Stomper, and knew him to be an member of the Avenues gang.

7

On February 21, 2008, when Mallari's employer, Martin Martinez, asked him to make a bank deposit, he left for the bank at 11:00, driving the Martinez family van. Mallari made the deposit and was driving home when he decided to buy drugs on Drew Street. Upon his arrival he saw Segura and Valencia crouching between cars and holding guns. They relaxed and came out when they saw that it was Mallari. They explained they were about to go on a "mission" because someone had shot at their "homie" Diego that morning. They asked Mallari whether he was "down for" it. Mallari agreed, and saw defendant in the driver's seat of a white car and Leon in the back seat, wearing a mask. Mallari saw Real alone in another car. Segura passed Mallari both a .38-caliber revolver loaded with three rounds and some methamphetamine, which Mallari ingested on the way to Cypress Park. Mallari drove the van, with Segura and Valencia as passengers.

Once in Cypress Park neighborhood, the group searched for Cypress Park gang members. They stopped and asked a gardener where the Cypress Park gang members were, but he did not know. They then drove through the neighborhood until they saw a man walking with his granddaughter near a school. As the man picked up the child and walked faster, Segura said, "There he is, there he is." Leon, wearing his ski mask, jumped out of the backseat of the white car and taunted the man with his AK47 rifle. Segura and Valencia, holding guns, confronted the man before all three men took turns shooting him until he fell, still holding his granddaughter.

When they returned to the cars, Mallari asked whether they shot the little girl. One responded that it was none of his business and to "Just drive. Get out of here." Mallari accelerated and turned left on Isabel Street after passing defendant's white car, which turned right. One of Mallari's passengers said, "This is the shit we need to be doing." Two men fired at the van as it fled, and Mallari fired back, but he kept driving. Although a tire was losing air, the van made it back to the Avenues gang neighborhood with the sounds of sirens and helicopters nearby. The men hid their guns in a nearby apartment complex for Mallari to pick up later.

8

*The Drew neighborhood's familiarity with Officer Langarica*

Officer Langarica, who worked out of the Northeast Division, which included the Avenues gang area, had variously been assigned to patrol as a gang officer, a detective trainee, and as a member of a team assigned to the surveillance of known serious offenders.

In February 2008, Officer Langarica had been assigned to his surveillance team for a year. During the preceding year, he patrolled the area with a partner in the same unmarked, green Honda Accord four times a week at least once or twice each day, while wearing plain clothes. Because the Honda had tinted windows, the officers were not visible and Officer Langarica sometimes heard people yell such things as, "It is the police," and "There is the pigs"; or sometimes people made siren sounds, apparently to mock or taunt the officers. One summer day in 2007, when Officer Langarica was called to an apartment building on the 3400 block of Drew Street after shots had been fired, he saw graffiti on the building in which his name had been written and crossed out, with the numbers 187 written over it. Officer Langarica explained that 187 was the Penal Code section for murder. The graffiti also included "Fuck the injunction" and included the name of Officer Langarica's partner at the time, with "puto" (a derogatory term for male homosexuals) written nearby. A few days earlier, Officer Langarica and his partner, in a pursuit of a car involved in narcotics sales, saw Carlos "Stoney" Velasquez flee from that car before they lost sight of him.

Officer Langarica testified that he knew Leon very well, based on many contacts with him. On numerous occasions as Officer Langarica drove through the neighborhood, Leon would say such things as, "'Fuck L.A.P.D.' or 'Fuck you, Langarica,' or, 'Get out of my neighborhood.'" Officer Langarica had detained Leon about a dozen times, arrested him twice since 2003, and had about 20 casual encounters with him. About 25 contacts included conversations during which Leon addressed Officer Langarica by name. After both arrests, Officer Langarica remained with Leon throughout the booking process and interview, for a total of about six hours. In one case, Officer Langarica testified against Leon at a preliminary hearing and again at trial.

9

Real testified that he knew Officer Langarica from contacts over the past two years. Officer Langarica and other officers passed by the front of the building where they conversed many times. In addition, Real had seen Leon in conversation with Officer Langarica more than 10 times. Once, when Leon was 22 years old, Officer Langarica caught him tagging graffiti on trees, gave him a warning, and took the paint can away.

### *The attempted murders of Officers Langarica and Bain*

Officer Langarica and his partner, Officer Bain, both testified that they were on patrol together on February 21, 2008. Officer Langarica was driving the green Honda, both officers were wearing plain clothes as usual, and Officer Bain wore his badge on a lanyard tucked inside his shirt. At about 11:53 a.m., they heard a broadcast on their police radios about a shooing in Cypress Park, near Aragon Avenue and Isabel Street. Officer Langarica knew that shootings between the Cypress Park gang and the Drew Street clique of the Avenues gang had been an almost daily event for about a month, so he decided to go to the Drew Street neighborhood rather than the location of shooting, in anticipation of the return of suspects to their territory.

After a short wait, a small white Nissan came toward the officers, swerving in and out of oncoming traffic, and speeding past a stop sign. As the car got closer, Officer Langarica recognized the several occupants as Avenues gang members, including Leon in the front passenger seat, and defendant the driver. As soon as the white car passed, Officer Langarica made a U-turn and followed it to Drew Street, where it stopped in front of the building where Leon lived. As Officer Langarica drove, Officer Bain moved his badge to the outside of his shirt where it would be visible, and unholstered his gun.

When the officers' green Honda came within two car lengths behind the white Nissan, the Nissan stopped abruptly and Leon immediately came out armed with an AK47 rifle. The other occupants were also coming out of the car. Leon pulled a ski mask over his face, leveled the weapon, and began to fire into the officers' car while it was still moving. Officer Langarica immediately stopped the car, jumped out, and fired two rounds without hitting Leon. While Officer Bain was still in the passenger seat, Leon fired low toward the Honda, and then "walked" seven to ten rounds up the hood and

10

into the windshield, causing shattered glass to fall on Officer Bain, who had opened the door, leaned out, and returned fire through the space between the cabin and door. Officer Bain identified one of the other two men to get out of the Nissan as Gomez, and saw him firing at the officers as well. Officer Langarica saw one of the two men shooting at them, who he could not identify, hold the weapon behind him as he ran away. Officer Langarica then fired two more rounds, and Leon fell to the ground. After firing the second burst of shots at Leon, Officer Langarica saw Gomez get up from the ground, look in the officer's direction, and then run behind a building. There, Gomez was apprehended and taken away by ambulance with a gunshot wound.

When Real approached the scene crying and upset, Officer Langarica considered him a suspect, as Real was a known member of the Avenues gang. Despite repeated warnings to stop, Real kneeled by Leon, placed his hand under Leon's head, and replied, "Fuck you, Langarica. You just shot my brother." Other officers then arrived and took him away.

### *Real's account of the events after the attempted murders*

Real testified that February 21, 2008, was tax collection day. He awoke at 8:00 a.m. in his apartment building on the 3300 block of Drew Street, where Real also rented three other apartments for members or associates of his gang, including Leon. Real met with defendant and others later that morning in the parking lot behind the apartment building. Also present were Leon, Segura, Valencia, and Gomez. Gomez had a .380-caliber handgun in his cell phone holder. Real told Leon to go inside, and told defendant not to take along his brother.

Real then drove around the neighborhood collecting taxes. When he returned about 20 minutes later, the men who had been there earlier were gone, and Mallari arrived at the apartment building driving a minivan. Soon, Real received a message that Segura wanted Real to pick him up from the home of another Avenues gang member on Division Street. As Real drove there, he passed defendant in his white car, with a green car right behind the white car, traveling fast. Real heard gunfire and turned back.

11

Back at the apartment building, Real saw someone lying on the ground wearing a ski mask, with a firearm next to him, and another person rolling on the ground toward the back of the apartment building, away from the sidewalk. Real also saw Officer Langarica in the middle of the street, and recognized him immediately. Real saw another officer crouching behind a car, as though covering Officer Langarica with his gun. When Real recognized the person lying on the ground was his brother, he walked toward him, ignoring Officer Langarica's commands to stop. Real picked up Leon, shook him, and determined he was dead. Real confronted Officer Langarica, and as he walked back to his brother, other officers rushed him and placed him in handcuffs. When Real was released after a few hours, he went home. He later received a phone call from defendant, who was then a close friend of Real's. Defendant asked whether the gun had been found on Real's brother, and told Real that they were looking for his car. Real told him to be careful.

Real investigated the Salas shooting for the Mexican Mafia.[6] He spoke to Mallari and Valencia, who told him they had gone to Cypress Park to look for a Cypress Park gang member. Gomez, Leon, and defendant were in defendant's car, while Valencia, Segura and Mallari were in the minivan. Valencia said Leon had spotted a man, they stopped, Leon shot him, and then they all took turns shooting him. As they drove away, they exchanged fire with some Cypress Park gang members.

Defendant was arrested on February 25, 2008, after he was stopped, driving his white Nissan. In a recorded telephone conversation the next day, he told his mother and Real that he was being charged with Leon's murder, adding, "Rival supposedly snitched."

Tired of the gang life and pressured by his homies to retaliate against the police for killing Leon, Real spoke to the FBI in April 2008. The FBI had been conducting wiretap surveillance of the Avenues gang since January 2008, and did not contact Real

---

**6** As the Mexican Mafia discouraged assaults on children, Real reported back that no little girl was there, in an effort to avoid retaliation against his gang and the members involved.

12

again until after June 25, 2008, when agents raided his Drew Street apartment building, throwing smoke grenades and flash bombs. Real and other Avenues gang members were arrested. Real ultimately pled guilty to racketeering and conspiracy to sell narcotics.

**DISCUSSION**

## I. Jury instructions

### A. Instructions requested by the prosecution

Defendant contends that the trial court erred in instructing the jury on derivative liability based on conspiracy and the natural and probable consequences doctrine. As the evidence did not show that defendant personally fired at the officers, but instead that defendant drove the car from which Leon and Gomez emerged before firing at them, the prosecution advanced three theories of defendant's derivative culpability for the attempted murders: direct aiding and abetting; the natural and probable consequences doctrine; and conspiracy. The trial court instructed the jury with CALCRIM Nos. 400, 401, 402, 416, 417, 418, and 419.

### B. Natural and probable consequences

Defendant contends that the trial court erred in instructing the jury that it could find him guilty of the attempted murders of the officers if it found that that shooting was a natural and probable consequence of the shooting of Salas. We are unable to find such an instruction.

The trial court instructed the jury as to direct aiding and abetting with CALCRIM No. 401, and as to the natural and probable consequences doctrine with CALCRIM No. 402. The latter instruction separately included the elements required for a finding that the assault upon Alyssa was the natural and probable consequences of the shooting of Salas, and the elements required for a finding that the attempted murders of the two officers were the natural and probable consequences of the assault upon the two officers. As to the attempted murders, the trial court read:

> "The defendant is charged in counts 4 and 5 with attempted murder in violation of Penal Code sections 664 and 187. One theory that the People are relying upon is that the defendant and a coparticipant intended to commit the crime of assault with a semiautomatic firearm in those counts in

13

violation of Penal Code Sections 245(b) and that the crime of attempted murder was a natural and probable consequence of that crime. Under this theory, in order to find the defendant guilty of attempted murder in either or both of counts 4 and 5, the People must prove the following: one, the defendant or a coparticipant committed the crime of assault with a semiautomatic firearm upon Carlos Langarica and/or Joseph Bain beyond a reasonable doubt; two, during the commission of the crime of assault with a semiautomatic firearm, the crime of attempted murder was committed; three, under all the circumstances a reasonable person in the defendant's position would have known that the crime of attempted murder is a natural and probable consequence of the commission of assault with a semiautomatic firearm. . . . A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. . . . Also, if the assault with a semiautomatic firearm upon Carlos Langarica and/or Joseph Bain . . . were committed for a reason independent of the common plan to commit attempted murder, then the commission of attempted murder was not a natural and probable consequence of assault with a semiautomatic firearm."

"[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Similarly, if a person aids and abets only an intended assault, but an attempted murder results, that person may be guilty of an unintended attempted murder, if it is a natural and probable consequence of the intended assault. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1054; see *People v. Chiu* (2014) 59 Cal.4th 155, 161-162.) In both examples, the intended assault is called the target offense, while the unintended murder or attempted murder is the nontarget offense. (See *People v. Chiu*, *supra*, at p. 161.)

14

We agree with respondent that defendant's contentions must be rejected as they are based upon a false factual predicate. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 136.) It is apparently defendant's understanding that the challenged instruction identified the Salas shooting as the target offense and the attempted murders of the police officers as the nontarget offense. Based upon this belief, defendant contends that the armed assaults upon the officers by Leon and Gomez were caused by "independent intervening acts" rather than the natural and probable consequences of the Salas shooing.[7] Contrary to defendant's apparent understanding, the instruction identified the assault on the officers as the target offense and the attempted murders as the nontarget offenses.[8] As long as the jury was instructed that the prosecution must prove that the nontarget offense was reasonably foreseeable, there was no need to require proof that the actions of Gomez and Leon were not independent intervening acts. (See *People v. Smith* (2014) 60 Cal.4th 603, 616-617.)

The instruction was properly given. Defendant does not contend that there was insufficient evidence that he directly aided and abetted the assault by Leon and Gomez on the two officers. When defendant abruptly stopped his car, the two assailants immediately jumped out and quickly began firing their weapons. Such facts suggest that defendant knew that Gomez and Leon intended to fire at the officers, and that he stopped the car when they were ready to do so in order to facilitate the assault. To justify an instruction on a natural and probable consequences theory, the prosecution was not

---

[7]  Defendant cites the verdict of not guilty on count 3, the murder of Leon, and contends that his acquittal of that count provided substantial evidence to support his theory that the attempted murders were the result of an independent intervening act. An acquittal on one count, even if factually inconsistent with a count under which the defendant was convicted does not provide evidence or demonstrate any insufficiency of the evidence. (See *People v. Santamaria* (1994) 8 Cal.4th 903, 911; *People v. Hussain* (2014) 231 Cal.App.4th 261, 273; § 954.)

[8]  Defendant also contends that the prosecutor argued that defendant was guilty of the attempted murders because he aided and abetted or conspired to murder a rival gang member, and the later shootings at the officers were natural and probable consequences. Defendant is similarly mistaken.

15

required to present evidence that defendant actually foresaw that his companions would attempt to murder the officers as "liability '"is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.]" (*People v. Chiu, supra*, 59 Cal.4th at pp. 161-162.) It is reasonably foreseeable that aiding and abetting an assault with a deadly weapon will result in attempted murder. (See *People v. Montes, supra*, 74 Cal.App.4th at p. 1054.)

### C. Conspiracy instruction

Defendant contends that the instructions regarding conspiracy as a theory of derivative criminal liability were erroneous as applied to the attempted murders of the two police officers.

"'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . . Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. . . ." (*People v. Kauffman* (1907) 152 Cal. 331, 334 (*Kauffman*); see also *People v. Prettyman* (1996) 14 Cal.4th 248, 261.)[9]

The trial court instructed the jury on the elements of conspiracy and the criminal responsibility of each member of the conspiracy for the statements and acts of each other member of the conspiracy, for the purpose of accomplishing the goal of the conspiracy. The court further instructed that the prosecution was required to prove that defendant agreed with one or more coparticipant to commit murder, and that he or one of the other coparticipants committed one or more of the following overt acts: "(1) one or more of

---

[9] Unlike here, *Kauffman* involved the liability of a coconspirator in a charged conspiracy, rather than using an uncharged conspiracy as an alternative theory of derivative culpability. (See *Kauffman, supra*, 152 Cal. at p. 334.) Since then, "later decisions have applied the 'natural and probable consequences' doctrine to aiders and abettors. [Citations.]" (*Prettyman, supra*, 14 Cal.4th at pp. 260-261.)

the coconspirators armed themselves with firearms; (2) one or more of the coconspirators drove into rival gang territory; (3) one or more of the coconspirators exited from a vehicle; and (4) one or more of the coconspirators shot Marco Salas."

As relevant here, the court also instructed:

> "A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan. To prove that the defendant is guilty of the crimes charged in counts 2, 4, 5 and 6, the People must prove that: one, the defendant conspired to commit one of the following crimes: murder; two, a member of the conspiracy committed murder; and three, assault with a semiautomatic firearm (count 2), attempted murder (counts 4 and 5), and shooting into an occupied motor vehicle (count 6), were the natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit. . . . A conspiracy member is not responsible for the acts of other conspiracy members that are done after the goal of the conspiracy has been accomplished."

Defendant contends that the instructions were inapplicable to the attempted murders of the two police officers. He argues that the object of the conspiracy was to kill a rival gang member and that the conspiracy had necessarily ended when that object was accomplished by the killing of Salas; thus, he concludes, the attempted murders could not be the natural and probable consequence of the conspiracy to commit a murder in rival gang territory.[10]

Defendant asserts that at the time of the shootout with the officers, the conspiracy to kill a rival gang member could not be "deemed still operative merely because the conspirators act[ed] in concert to avoid 'detection and punishment' [Citations.]" (*People*

---

[10] Although the instructions allowed the jury to determine whether the attempted murders were committed in furtherance of the common plan which included the murder of Salas, the prosecutor did not advance such a theory in summation. The prosecutor discussed the conspiracy to commit the murder in rival gang territory only as a theory of liability for the murder of Salas. With regard to the attempted murders of the officers, the prosecutor's conspiracy argument was that defendant conspired with others to assault the officers with a firearm, and a natural and probable consequence of that conspiracy was attempted murder.

*v. Leach* (1975) 15 Cal.3d 419, 431; see also *People v. Saling* (1972) 7 Cal.3d 844, 852-853 (*Saling*) [adopting the rule of *Krulewitch v. United States* (1949) 336 U.S. 440, 443].) As we construe defendant's arguments, he implies that, as *a matter of law*, participants in a murder conspiracy cannot be responsible for the actions of coconspirators once the victim is dead, and that, also as a matter of law, murder conspiracies do not include a plan to escape detection and arrest.

Rejecting a similar argument over 100 years ago, the California Supreme Court held that the duration of the conspiracy and whether it included a goal of avoiding detection and forcibly resisting arrest were questions of fact for the jury to determine. (*Kauffman, supra*, 152 Cal. at pp. 335, 338.) These remain jury questions today. (See, e.g., *People v. Hardy* (1992) 2 Cal.4th 86, 143; *Saling, supra*, 7 Cal.3d at p. 852; *People v. Zielesch* (2009) 179 Cal.App.4th 731, 741-742.) It is generally true that a "conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated. [Citations.]" (*Saling*, at p. 852.) However, it is not a matter of law, but a question "for the trier of fact -- considering the unique circumstances and the nature and purpose of the conspiracy of each case -- to determine precisely when the conspiracy has ended. [Citations.] Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy. [Citations.]" (*Ibid.*; see also *People v. Hardy, supra*, at pp. 143, 146 ["no rigid rules exist in this area"].)

For example, in *Kauffman*, the defendant argued that as a matter of law, the conspiracy ended when the common plan was abandoned and the coconspirators left the area where the intended crime was to be committed. (*Kauffman, supra*, 152 Cal. at p. 338.) There, the defendant and several friends who lived in San Francisco devised a plan to break into a safe in a San Mateo County cemetery. (*Id*. at pp. 332-333.) They armed themselves with nitroglycerin, guns, and burglary tools, went to the cemetery, but when they discovered an armed guard on the premises, they abandoned their plan and returned to San Francisco. On their way home, they encountered a police officer, a gunfight

18

ensued between the officer and the friends, and the officer was killed. The defendant was unarmed, had his hands up, and did not participate in the shooting, but was charged with and convicted of the officer's murder as a coconspirator. (*Id*. at pp. 333-334.) The court found substantial evidence to support an instruction and a finding that the criminal design included an agreement to avoid detection and arrest while going to and coming from the scene of the proposed burglary. (*Id*., at pp. 335-337.) The court cited the following facts: the six coconspirators divided their group into two parties of three, apparently to avoid suspicion; five of them were armed with deadly weapons; and if the burglary tools they carried were discovered by law enforcement, they would be arrested. (*Ibid*.; also cf. *People v. Durham* (1969) 70 Cal.2d 171, 180-181.)

Here too, substantial evidence suggested that a simultaneous goal of the conspiracy was to avoid detection and if necessary, forcibly and violently resist arrest. The shooting of Salas was a mission of retaliation for the assault on a fellow gang member. Evidence suggesting prior agreement on methods of undertaking such a mission is found in Detective Aguilar's expert testimony that violent assaults on rival gang members were among the gang's common criminal activities, and that violent assaults on police officers were among the primary criminal activities of the Avenues gang, undertaken in part to make residents afraid to cooperate with law enforcement. Defendant and his coparticipants went in two cars and fled the scene in different directions, suggesting a preconceived plan to facilitate their escape. All of the occupants of the van were armed with firearms, and at least two of the occupants of defendant's car were armed. Leon, an occupant of defendant's car, was armed with an assault rifle, more firepower than necessary to kill one person, also suggesting a preconceived plan to facilitate an escape.

Under such circumstances, the trial court did not err in granting the prosecution's request for the conspiracy instructions. The instructions properly allowed the jury to determine the existence, duration, and scope of a conspiracy to commit murder; and they made clear that defendant could not be convicted under this theory unless the acts of

19

coconspirators furthered the common plan, were a natural and probable consequence of the plan, and were committed before the goal of the conspiracy had been accomplished.

As the trial court did not give legally erroneous instructions regarding aiding and abetting or conspiracy, we need not reach defendant's contention made pursuant to *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129, and *People v. Green* (1980) 27 Cal.3d 1, 69-71, that because the jury was instructed on both legally correct and legally incorrect theories, reversal is required unless the record shows that the jury based its verdict on the correct theory.

## II.  Substantial evidence

Defendant contends that his sentences must be reduced to life in prison, because substantial evidence did not support the jury's true findings that he knew or reasonably should have known that Officers Langarica and Bain were peace officers engaged in the performance of their duties.

Section 664, subdivision (e) provides in relevant part:  "[I]f attempted murder is committed upon a peace officer . . . , and the person who commits the offense knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties, the person guilty of the attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."

First defendant contends that section 664, subdivision (e) cannot be construed to apply to an aider and abettor under the natural and probable consequence doctrine; and he therefore asks that we hold that the statute requires a finding that the aider and abettor personally shared the perpetrator's actual or constructive knowledge that the victim was a police officer.  Defendant then argues that there was no substantial evidence that the perpetrators knew or should have known that the victims were police officers.

As defendant has not explained how a person can share another person's *constructive* knowledge, and has not cited to examples in the case law, we have no basis to believe that the Legislature intended such a meaning.  It is unnecessary in any event, as substantial evidence supports a finding that defendant personally had constructive

20

knowledge that Officers Langarica and Bain were peace officers engaged in the performance of their duties.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Defendant summarizes the circumstances in which he concludes it would be only speculative to find that he, Leon, or Gomez recognized Officer Langarica, and that it would be more reasonable to conclude that Leon thought the officers were rival gang members who had chased them from the scene of the Salas shooting. Defendant acknowledges the extensive prior contact between Leon and Officer Langarica, but notes that there was little or no evidence that defendant had come into prior contact with the officers or that he personally knew that the officers regularly patrolled the neighborhood driving the green Honda while wearing plain clothes. In addition, defendant points out that he remained in the driver's seat of his car during the shootout. There was no evidence indicating that defendant looked in the officers' direction. He adds that Leon wore a mask over his face, and rival gang members had fired shots at the Avenues cars as they fled the scene of the Salas shooting, just minutes earlier. Defendant concludes that this evidence precludes an "objectively reasonable" inference that he or his companions reasonably should have known that the two men in the green Honda were peace officers.

21

Reversal is not warranted merely because defendant is able to point to circumstances that might reasonably be reconciled with a finding that would defeat the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) Moreover, defendant has summarized only the evidence from which a jury might infer that defendant and his coparticipants had no *actual* knowledge of the victims' status. He has failed to summarize any of the ample evidence that would support a finding that he *reasonably should have known* that the victims were peace officers in the performance of their duties.

Our review of the record reveals overwhelming evidence to support the jury's finding. At the time of the shooting defendant was an active member of the Avenues gang, and as his tattoo advertised, defendant was "Drew Street by choice." Real, the Drew Street shot caller in charge of the neighborhood and defendant's close friend, knew Officer Langarica by sight. As soon as Real arrived at the scene of the shooting and before marked police vehicles arrived, Real immediately recognized Officer Langarica. Many other Drew Street gang members knew Officer Langarica by sight as well, even though the officer was behind the tinted windows of his green Honda. During an entire year prior to the shooting, Officer Langarica had patrolled the Drew Street neighborhood an average of four times a week, always in the same unmarked, green Honda Accord and wearing plain clothes. As he passed, Leon was heard to say such things as, "'Fuck L.A.P.D.' or 'Fuck you, Langarica,' or, 'Get out of my neighborhood.'" Officer Langarica and Real both testified that Leon knew Officer Langarica well, as they had many prior contacts.

Gomez's brother, Avenues member, "Stoney" Velasquez, also knew Officer Langarica by sight. Six months or so before the shooting, Officer Langarica and his partner pursued Velasquez by car as he fled the scene of suspected narcotics sales. Just a few days later, Officer Langarica observed gang graffiti on a building on the 3400 block of Drew Street, where his name was crossed out with "187" written over it. From such circumstances, the jury could reasonably infer that Velasquez recognized Officer Langarica during the chase and that he informed the neighborhood who had pursued him.

22

In sum, Real knew Officer Langarica by sight; Leon knew Officer Langarica and his green Honda by sight; and Gomez's brother, as well as other Drew Street gang members and residents knew Officer Langarica and his green Honda by sight. Officer Langarica and his green Honda were well known and easily recognized in the Drew Street neighborhood on February 21, 2008. Defendant and his fellow gang members were speeding back from rival gang territory after aiding and abetting a murder, when the green Honda began following them. Leon and Gomez were ready to jump from the car and start firing when defendant abruptly stopped, leading to the conclusion that the three gang members must have discussed their getaway strategy. Under the circumstances, a jury could reasonably conclude that a Drew Street Avenues gang member, such as defendant, knew that the green Honda was occupied by two peace officers who were pursuing him and his companions in the course of their law enforcement duties.

## III. Gang related evidence

### A. Defendant's contentions

According to headings in defendant's opening and reply briefs, the third assignment of error is the following: "The erroneous admission of extremely inflammatory and irrelevant evidence of gang membership violated appellant's federal constitutional right to due process." Despite this assertion, the evidence thereafter challenged in the briefs cite the following three instances of gang related evidence: (1) Officer Langarica's testimony regarding graffiti with his name in it; (2) Real's testimony regarding payment to defense lawyers for witness information in order to facilitate witness intimidation; and (3) Mallari's testimony regarding the murder of a deputy sheriff.

Due to the structure of defendant's arguments, it initially appears that defendant contends that all three pieces of evidence should have been excluded under Evidence Code sections 210, 352, and 1101, subdivision (a).[11] However, only the first (Officer Langarica graffiti) appears to involve all three grounds for the exclusion of evidence,

---

[11] All further statutory references in this section of the Discussion are to the Evidence Code, unless otherwise indicated.

while the second (Real's efforts regarding witness intimidation) appears to be based only on section 352. The third item (murder of a deputy sheriff) is not an evidentiary challenge at all; rather, defendant contends that defense counsel rendered constitutionally ineffective assistance by eliciting this testimony from Mallari.

"We discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis. [Citations.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.) We thus do not discuss any issue relating to evidence of defendant's gang membership or any other contention that has not been clearly articulated.

### B. *Admissibility of evidence*

"[A]n appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion. [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) We may not disturb the trial court's ruling on the admissibility of evidence "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

A challenge to the admissibility of evidence is generally not cognizable on appeal in the absence of a specific and timely objection in the trial court on the ground urged on appeal. (§ 353.) Where there is no objection or the objection fails to fairly express the specific reason for excluding the evidence, the trial court cannot be said to have abused a discretion it was never asked to exercise. (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

A contention that it was a denial of due process to admit evidence cannot revive an appellate challenge after it has been forfeited due to the failure to make a timely and specific objection. (*People v. Geier* (2007) 41 Cal.4th 555, 611, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) Thus, as defendant made no constitutional objection to any of the three items of evidence, he must first demonstrate that he properly objected to each item of challenged evidence on state law

grounds and that the trial court abused its discretion in overruling the objection; only then may he argue that the error had an additional legal consequence of violating due process. (*People v. Partida, supra*, 37 Cal.4th at pp. 437-438.)

### 1. Item No. 1: graffiti

Defendant contends that Officer Langarica's testimony should have been excluded under section 210 as irrelevant, and under section 1101, subdivision (a), as improper propensity evidence. Defendant concedes that he did not object to the evidence in the trial court, but suggests that an objection would have been futile, and asks that we exercise discretion to reach the issue. He further asserts ineffective assistance of trial counsel by his failure to object. We agree that any objection to the evidence would have been futile, as the trial court most certainly would have overruled it as meritless.

Section 1101, subdivision (a) provides that character evidence or evidence of specific instances of past conduct is inadmissible when offered to prove the defendant's conduct on a specified occasion; however, subdivision (b) provides that such evidence is admissible to "prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident)." "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

As we discussed in the last section, the evidence of Officer Langarica's name as part of graffiti was relevant to the issue of whether defendant should have known that it was Officer Langarica's green Honda pursuing him after the Salas murder; and it was highly probative of that issue, as it demonstrated the officer's renown among Avenues gang members in the Drew Street neighborhood. Further, as the evidence was highly probative on the issue of knowledge and absence of mistake regarding the status of the officers, it was not inadmissible propensity or character evidence. (See § 1101, subd. (b).) Moreover, as there was no suggestion that defendant was responsible for the graffiti, the evidence did not suggest defendant's criminal propensity. Counsel's

"[r]epresentation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

### 2. Item No. 2: witness intimidation

Defendant contends that the trial court erred in failing to exclude Real's testimony regarding payment to defense lawyers for information used by the gang to intimidate witnesses. Defense counsel objected to the testimony under section 352, arguing that it was prejudicial as "damning to people sitting on [the defense] side of the table." Although the trial court did not expressly overrule the objection, it permitted Real to continue his testimony. Real named the three defense attorneys who supplied Real with information about non-gang member witnesses who would be testifying against Avenues members.

Defendant also contends that *if* the evidence was probative of the criminal nature of the Avenues gang, it was cumulative to evidence of defendant's gang membership. The evidence was in fact probative of the gang's criminal nature. Witness intimidation is a criminal activity that may prove that a gang is a criminal street gang, which must be shown to apply the gang enhancement of Penal Code section 186.22, subdivision (b), as alleged here. (See § 186.22, subd. (e)(8) & (f).) Defendant fails to demonstrate how this evidence of the criminal nature of the Avenues gang was cumulative to evidence of his gang membership.

Moreover, defendant failed to assert this ground for the objection in the trial court. Indeed, the only basis under section 352 which defense counsel articulated was that evidence of "dirty criminal defense attorneys" would be prejudicial. Counsel did not argue that it would be more prejudicial than probative, and did not complain that it was cumulative.[12] Defendant has failed to demonstrate that the trial court acted arbitrarily,

---

[12]     In defendant's opening brief, under the heading, "Factual and procedural background," defendant refers to the prosecution's pretrial motion in limine and the hearing on the motion, including defense counsel's indication to the court that there had been several days of gang evidence presented at the preliminary hearing, followed by the statement: "I assume they are going to have a similar amount, but there does come a point in time when I may object and say, 'Your Honor, it's become cumulative.'" We

26

capriciously, or in a patently absurd manner in admitting the testimony. (See *People v. Goldsmith, supra*, 59 Cal.4th at p. 266.)

Nor has defendant demonstrated that the admission of the evidence resulted in a miscarriage of justice. During recess a short while after defense counsel objected to the testimony, he asked the trial court to consider instructing the jury that the two defense attorneys in this case were appointed and that this witness (Real) had nothing to do with retaining them. The prosecutor had no objection, and the court told defense counsel to prepare such an instruction and work out the language with the prosecutor. Counsel agreed to do so, and then represented to the court that they had discussed the issue and agreed on some language. When the jury returned, the trial court instructed: "I just wanted to advise you of the following, and that is that Mr. Carrillo's attorneys, that's Mr. Andrew Stein and Mr. Jonathan Roberts, were both appointed by the court and were never retained by witness Francisco Real."

Although the trial court admonished the jury in the language agreed upon by counsel, defendant now contends that no instruction could have dispelled the potential prejudice resulting from tarnishing the image of the two defense attorneys in this case. We disagree. Any prejudice "'must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.)

As defendant has not shown that the trial court abused its discretion or that the court's ruling resulted in a miscarriage of justice, defendant has not preserved a due process issue. (See *People v. Partida*, *supra*, 37 Cal.4th at pp. 437-438.)

---

reject any implication that such comments amounted to an objection or otherwise preserved the issue for appeal. To preserve the issue for appeal, an objection must be made at the time the evidence is actually offered. (*People v. Jennings* (1988) 46 Cal.3d 963, 975-976, fn. 3.)

## C. *Effective assistance of counsel*

Defendant contends that defense counsel rendered constitutionally ineffective assistance by eliciting Mallari's testimony about the murder of Deputy Juan Escalante. The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674 (*Strickland*); see also Cal. Const., art. I, § 15.) "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

It is presumed that "counsel's performance fell within the wide range of professional competence . . . . Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (*Strickland, supra*, 466 U.S. at p. 689.)

Defendant refers to cross-examination testimony elicited by defense counsel, as well as follow-up testimony elicited by the prosecutor on redirect examination. During cross-examination Mallari testified that in an interview with a detective and the prosecutor he attempted to trade information for a plea deal by telling his interviewers that he could help them solve "a bunch of murders that went down years ago," including the murder of a police officer. He said he knew "all about this stuff." Mallari testified that in another interview, he told detectives that he knew who had murdered Deputy Escalante. He explained: "I was hoping the information I provided was going to help me with my case, and I was hoping for it to reduce my time."

On redirect examination, Mallari testified that he obtained information about the murder of Deputy Escalante in Cypress Park in August 2008; he had not witnessed the crime, but knew who was involved. He spoke about it to two detectives from the Sheriff's Department, but they promised him nothing.

Defendant contends that defense counsel's performance was deficient because it "opened the door to otherwise inadmissible and highly damaging evidence that the Avenues gang was responsible for the murder of a deputy sheriff."[13] Defendant does not contend that defense counsel failed to provide an explanation or there simply could be no satisfactory explanation for the cross-examination. Indeed, he recognizes that the purpose of the cross-examination was to impeach Mallari's credibility. His complaint appears to be that in hindsight, counsel went further than necessary to show Mallari's motive in testifying against defendant.[14] Hindsight and second-guessing does not satisfy

---

[13] Defendant argues that because Mallari described himself as a trusted associate of the Avenues gang, the jury would infer that the gang was responsible for the deputy's murder. The jury did not need to infer: Real testified without objection that Avenues gang members were charged with that murder, and that he testified at their preliminary hearing.

[14] Defendant argues, in effect, that defense counsel admitted his error and attempted to do damage control by arguing to the jury that the evidence was "not relevant" or that it was "irrelevant." Counsel did not argue that the evidence was irrelevant; he simply argued that the murder of Deputy Escalante had "nothing to do with this trial."

29

defendant's burden to overcome the presumption that counsel's performance was reasonable under prevailing professional norms. (See *Strickland, supra*, 466 U.S. at pp. 688-689.)

Nor has defendant met his burden to show prejudice by affirmatively demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.) Defendant argues that prejudice resulted because it was highly inflammatory to connect the Avenues gang with the death of a deputy sheriff, as it would lead the jury to conclude that Avenues gang members would also intend to murder Officers Langarica and Bain. Defendant fails to explain how the absence of the information that other Avenues gang members murdered a deputy sheriff would lead the jury to disregard the overwhelming evidence presented in this case that defendant, Leon, and Gomez intended the armed assault upon the officers, that Leon fired a semiautomatic assault rifle directly toward the officers, and that the natural and probable consequences of such an assault was an attempted murder. We conclude that a rational jury would not have disregarded that evidence and thus, there is no reasonable probability that the outcome would have been more favorable to defendant without mention of the murder of Deputy Escalante.

### D. Cumulative error

Defendant contends that the cumulative effect of the admission of the three items of evidence was to deny him a fair trial. Because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial," we must reject defendant's claim of prejudicial cumulative effect. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## IV. Section 12022.53

### A. Equal protection

Defendant contends that the sentence enhancement imposed under section 12022.53 violated his constitutional rights to equal protection and due process. When

read together, subdivisions (d) and (e)(1) of section 12022.53 require the trial court to add a consecutive 25 years to life term to the sentence of a defendant convicted of murder or attempted murder for the benefit of a criminal street gang, when the jury finds that a principal in the offense personally and intentionally discharged a firearm, causing death or great bodily injury to the victim. In non-gang cases, the 25 years to life term is imposed only on the principal who intentionally discharged the firearm. (See § 12022.53, subd. (d).)

"Broadly stated, equal protection of the laws means 'that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.' [Citation.]" (*People v. Wutzke* (2002) 28 Cal.4th 923, 943.) In making such a claim, the defendant bears the burden to show "'that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199, overruled on other grounds in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 879.) "Where . . . a statute involves neither a suspect class nor a fundamental right, it need only meet minimum equal protection standards, and survive 'rational basis review.' [Citation.]" (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*).)

Defendant argues that a person who aids and abets the personal use or discharge of a firearm in a gang case is similarly situated to the aider and abettor in a non-gang case, simply because the aider and abettor commits the same acts in each case. We disagree. "Unlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct." (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 13 (*Gonzales*).) We also reject defendant's contention that the statute is subject to strict scrutiny because it involves a fundamental liberty interest. There is no fundamental interest in the specific term of imprisonment a criminal defendant might receive. (*Turnage, supra*, 55 Cal.4th at p. 74; *People v. Wilkinson* (2004) 33 Cal.4th 821, 838.)

31

As defendant acknowledges, two other appellate courts have applied the rational basis test to reject similar equal protection challenges to section 12022.53. (*People v. Hernandez* (2005) 134 Cal.App.4th 474, 480-483 (*Hernandez*); *Gonzales, supra*, 87 Cal.App.4th at pp. 12-13.) The state has a legitimate interest in suppressing criminal street gangs and "'the serious threats posed to the citizens of California by gang members using firearms'"; this rationally justifies a greater punishment for those who aid and abet gang related shootings that result in death or great bodily injury. (*Hernandez*, at pp. 481-482, fn. omitted.) Thus the greater punishment provided by section 12022.53 under such circumstances "'is not prohibited by the equal protection clause from striking the evil where it is felt the most." (*Id*. at p. 482, fn. omitted; see also *Gonzales*, at pp. 12-13.) We agree with the reasoning of those cases and find no merit to defendant's equal protection claim.

### B.  Due process

Defendant cites the rule that *conviction* as an aider and abettor requires proof that the aider and abettor had knowledge of the intent and criminal purpose of the perpetrator. (See *People v. Beeman* (1984) 35 Cal.3d 547, 555.) Then, relying on that rule, defendant contends that section 12022.53, subdivision (e) violates due process by imposing vicarious liability to *increase the sentence* of the aider and abettor without proof that he knew or intended that the perpetrator would commit homicide by the use or discharge of a firearm. Without further discussion, defendant concludes that the statute therefore violates due process, citing *In re Winship* (1970) 397 U.S. 358 [due process requires proof beyond reasonable doubt of every fact necessary constituting the crime], and *Mullaney v. Wilbur* (1975) 421 U.S. 684 [prosecution's burden to negate heat of passion].

These cases do not hold that due process prohibits firearm enhancements for an aider and abettor unless the aider and abettor knew and intended that the crime he intended to facilitate was going to be committed with a gun. Moreover, a firearm enhancement is not an element of a crime; and it does not define a crime, but rather the circumstances under which the crime is committed.

To further the legislative intent to counter "the serious threats posed to the citizens of California by gang members using firearms," section 12022.53, subdivision (e) was "expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang. Section 12022.53, subdivision (e) is precisely the clear expression of legislative intent to extend an enhanced penalty to aiders and abettors" without any requirement to prove the aider and abettor's knowledge or intent regarding the firearm. (*Gonzales, supra*, 87 Cal.App.4th at pp. 15, 19; accord, *Hernandez, supra*, 134 Cal.App.4th at p. 483.) Defendant has not demonstrated that application of the statute violates due process.

## V. Active participation in criminal street gang

Defendant contends that the special circumstance provision of section 190.2, subdivision (a)(22), is unconstitutionally vague, as it did not did not give him adequate notice of what conduct would trigger the punishment it provides. He concludes that the true finding under that provision must be stricken.

Section 190.2, subdivision (a)(22), provides the death penalty or imprisonment for life without the possibility of parole for a defendant who is found guilty of murder in the first degree if the following special circumstance has been pled and proven: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

Section 186.22 is part of the California Street Terrorism Enforcement and Prevention Act, also known as the STEP Act; and as defendant concedes, the California Supreme Court has held that the terms, "actively participates" and "active participation" as used in the STEP Act, are not unconstitutionally vague and do not fail to give fair warning of the prohibited conduct. (*People v. Castenada* (2000) 23 Cal.4th 743, 744-745, 751-752.) Defendant also acknowledges that we are bound by the court's interpretation. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, defendant disagrees with its reasoning, and raises the issue in order to preserve

33

it for further appeal. We defer to the California Supreme Court and reject defendant's due process challenge.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT